UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 Case |
|  | ) |  |
|  | ) | Case Nos. 00-34533 through |
| HEILIG-MEYERS COMPANY, et al., | ) | 00-34538 |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

**DEBTORS' REPLY TO THE EQUITY COMMITTEE'S OBJECTION
TO DEBTORS' APPLICATION TO RETAIN LAZARD FRERES & CO. LLC
AS INVESTMENT BANKER AND FINANCIAL ADVISOR**

Heilig-Meyers Company, a Virginia corporation, Heilig-Meyers Furniture

Company, a North Carolina corporation, Heilig-Meyers Furniture West, Inc., an Arizona

corporation, HMY Star, Inc., a Virginia corporation, HMY Roomstore, Inc., a Virginia

corporation, and MacSaver Financial Services, Inc., a Delaware corporation, the above-captioned

debtors and debtors in possession (collectively, "Heilig-Meyers" or the "Debtors"), as and for

their reply (the "Reply") to the objection (the "Objection") of the Equity Committee to the

Debtors' Application for Authorization to Employ Lazard Freres & Co. LLC as their Investment

Banker and Financial Advisor (the "Application"), respectfully represent:

**PRELIMINARY STATEMENT**

1.      The terms and conditions of the Debtors' proposed retention of Lazard

Freres & Co. LLC ("Lazard") are reasonable, usual and customary within the industry, and

appropriately may be approved at this time by this Court pursuant to sections 327 and 328 of the

Bankruptcy Code.  Thus, notwithstanding the Equity Committee's objections that (a) the

compensation that the Debtors propose to pay to Lazard is "exorbitant" and (b) due to the fixed-

fee structure of the compensation, there purportedly is no means whereby the Debtors can ensure

813907.4

that Lazard is performing services commensurate with the proposed compensation, this Court

should authorize and approve the Debtors' retention of Lazard and grant the Application.

## **BACKGROUND**

2.      Unless otherwise set forth below, the facts and defined terms relevant to

this Reply and the Objection are set forth in the Application and are incorporated herein by

reference.[1]

3.      On August 16, 2000 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Eastern District of Virginia.

4.      On the Petition Date, the Debtors filed, among other "first day" pleadings,

the Application to retain Lazard as their investment banker and financial advisor.  Prepetition,

Lazard and the Debtors entered into an engagement letter dated as of July 1, 2000 (the "Original

Engagement Letter").  Pursuant to the Original Engagement Letter, Lazard agreed to be the

financial professional responsible for assisting the Debtors in developing, designing, negotiating

and implementing any strategies necessary to effect a successful restructuring transaction (the

"Restructuring").

5.      In the context of the Restructuring, Lazard agreed to perform the services

outlined in the Application, including, but not limited to:

- •      Assisting the Debtors in reviewing and analyzing their businesses, operations and financial projections;

---

[1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Application.

813907.4

- Evaluating the Debtors' debt capacity in light of projected cash flows;

- Determining the appropriate capital structure for the reorganized companies;

- Developing strategies for negotiating with the holders of existing debt obligations and with lenders in connection with restructuring;

- Preparing documentation required in connection with restructuring existing debt obligations;

- Conducting any sales of assets;

- Assisting in arranging debtor-in -possession financing; and

- Providing any appropriate general restructuring advice.

Lazard's vast experience, intimate knowledge of and continued assistance to the Debtors, which will be required in order to complete successfully any Restructuring, make Lazard singularly qualified to act as the Debtors' investment banker and financial advisor.

6.     Since the filing of the Application, Lazard has engaged in numerous discussions with the Creditors' Committee concerning the terms of the Debtors' engagement of Lazard and the circumstances under which certain compensation would be paid.  Ultimately, after extensive discussions and negotiations, Lazard agreed to modify the terms of its engagement to resolve certain of the concerns raised by the Creditors' Committee.  A revised copy of the Original Engagement Letter (blacklined to show changes from the Original Engagement Letter, the "Revised Engagement Letter") is annexed hereto as Exhibit "A."

7.     The more salient changes reflected in the Revised Engagement Letter are as follows:

a)     The definition of a "Restructuring" was modified to make clear that it only applied to consummation of a plan of reorganization pursuant to which (i) the Debtors reorganize with no less than 300 stores, (ii) the Debtors reorganize with less than 300 stores and the Debtors or their estates receive the proceeds of the sale on a going concern basis of no less than

-3-

813907.4

the number of stores equal to the difference between 300 and the number of stores with which the Debtors reorganize, or (iii) the Debtors do not reorganize but receive the proceeds of the sale on a going-concern basis of no less than 300 stores.  The import of this change is that (subsection to paragraph 7(b) below) Lazard will only receive a Restructuring Fee in the event these higher Restructuring thresholds are satisfied.  Moreover, in connection with the consummation of any Restructuring, Lazard also agreed to reduce its Restructuring Fee from $8,000,000 to $7,000,000.

b)      In addition, the concept of a "Smaller Restructuring" has been agreed to by the Debtors, Lazard and the Creditors' Committee.  Under the Revised Engagement Letter, a "Smaller Restructuring" is defined to mean the consummation of a plan of reorganization pursuant to which (i) the Debtors reorganize with less than 300 stores or (ii) the Debtors or their estates receive the proceeds of the sale on a going-concern basis of more than 50 but less than 300 stores.  The import of this change is that Lazard will only earn a $3,500,000 Restructuring Fee upon consummation of a Smaller Restructuring (rather than the $8,000,000 fee agreed to in the Original Engagement Letter).

c)      Lazard also has agreed to include Merger & Acquisition related services within the scope of its Restructuring Services, such that in the event the Debtors determine to pursue a Business Combination (as defined in the Original Engagement Letter), no additional M&A fee would be payable to Lazard.

## **ARGUMENT**

### A.      **The Economic Terms of Lazard's Retention Are Customary And Typical**

8.      In its Objection, the Equity Committee baldly asserts that "(t)he compensation proposed to be paid to Lazard Freres & Co. is exorbitant."  Simply stated, this objection is exaggerated and incorrect, as the agreed-upon compensation is reasonable, customary and within the range of compensation being paid in the market today.  Indeed, the concessions made by Lazard in the Revised Engagement Letter enhance the reasonableness of the compensation to be paid.  Therefore, this objection should be overruled.

9.      Although the Debtors have not been able to locate any controlling precedent in this district, the bankruptcy court in the Southern District of New York, in Drexel

813907.4

Burnham Lambert Group, Inc., 140 B.R. 367 (Bankr. S.D.N.Y. 1992) (hereinafter "Drexel"),

previously has stated the standards to be met in a debtor's retention of an investment banker.

Essentially, Drexel requires that an application to retain an investment banker (a) contain

information regarding fees to be paid, services to be performed, competitiveness of the retention

from an economic and skills perspective, expertise to be brought to bear and a description of the

selection process, and (b) attach a copy of the engagement letter.  The Application to retain

Lazard meets these standards.

10.     Courts repeatedly have held that professionals such as Lazard "are to be

compensated on market rates, rather than the principle of 'strict economy'."  In re Drexel

Burnham Lambert Group, Inc., 133 B.R. at 15.  "The unambiguous policy inspiring [this

principle]…is that professionals…in bankruptcy cases should earn the same income as their non-

bankruptcy counterparts."  In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 849 (3rd Cir.

1994); In re Merry-Go-Round Enterprises, Inc., et al., 244 B.R. 327 (Bankr. D. Md. 2000); In re

Drexel Burnham Lambert Group, Inc., 133 B.R. at 17 ("Congress directed Bankruptcy Courts to

compensate professionals at the market rate, reflected in rates generally accepted by the

professionals' clients, and not to impose lower or different rates or charges simply because it is a

reorganization proceeding.").  "It is not the function of judges in fee litigation to determine the

equivalent of the…just price [for the professional's services].  It is to determine what the

[professional] would receive if he were selling his services in the market rather than being paid

by court order."  In re Continental Illinois Securities Litigation, 962 F.2d 566, 568 (7th Cir.

1992).

11.     By this Reply and at the hearing to consider the Application, the Debtors

will establish that all fees to be paid to Lazard are fair and reasonable, and in conformity with

-5-

813907.4

fees paid for similar services in other cases.  In this regard, annexed hereto as Exhibit "B" is the Affidavit of Frank A. Savage III (the "Savage Affidavit"), who is a Managing Director at Lazard and the Lazard professional directly responsible for the Heilig-Meyers matter.  As the Savage Affidavit demonstrates, the fees to be paid to Lazard by the Debtors are market and generally accepted by Lazard's other clients.  Moreover, the fairness of the terms of the Revised Engagement Letter is further supported by the fact that Lazard's engagement is supported by the Creditors' Committee.  Finally, the retention of Lazard is necessary and appropriate in that various aspects of the Debtors' ongoing chapter 11 cases and prospective restructuring require expertise unique to the investment banking community in areas in which Lazard excels.

### (i)    Monthly Fee

12.    The Debtors have agreed to pay Lazard a monthly restructuring fee of $150,000 (the "Monthly Fee").  As a basis for comparison of the Monthly Fee to monthly fees paid to other investment bankers performing financial advisory services, annexed hereto as Exhibit "B" to the Savage Affidavit is a chart prepared by Lazard that lists the financial advisory and investment banking fees that Lazard and other investment bankers have received for their services in other similar engagements (the "Fee Chart").  As demonstrated by the Fee Chart, monthly fees for investment bankers representing debtors in comparable cases generally range from $100,000 per month to $200,000 per month.  Based on this range of fees, the $150,000 Monthly Fee the Debtors propose to pay Lazard is in the middle of the range.

### (ii)    Restructuring Fee

13.    Pursuant to the Revised Engagement Letter, the Debtors also have agreed to pay Lazard a $7,000,000 Restructuring Fee upon the completion of any Restructuring and a

-6-

813907.4

$3,500,000 Restructuring Fee upon the completion of a Smaller Restructuring.[2]  Significantly,

after the second monthly fee payment, all monthly fee payments made by the Debtors to Lazard

will be credited against the Restructuring Fee.  As set forth in the Savage Affidavit and

illustrated by the Fee Chart, the Restructuring Fee proposed in these cases (like the Monthly Fee)

is well within the range of transaction fees approved by the courts in comparable chapter 11

cases.

**B.**     **The Fee Structure of Lazard's Retention is Customary and Beneficial to the
Debtors' Estates and Provides the Debtors and the Court  with Ample Means
to Monitor Lazard's Performance of Services Under the Retention Agreement**

14.     The Equity Committee objects that, "due to the structure of [Lazard's]

compensation as fixed fees, there is no means to ensure that [Lazard] is performing services

commensurate with the proposed compensation."  This criticism of the fee arrangement between

the Debtors and Lazard is misplaced.  "If the most competent professionals are to be available

for complicated capital restructuring and the development of successful corporate reorganization,

they must know what they will receive for their expertise and commitment."  In re Merry-Go-

Round Enterprises, Inc., et al., 244 B.R. 327, 337, *citing* Matter of National Gypsum Company,

123 F.3d 861, 863 (5th Cir. 1997).

15.     Section 328(a) of the Bankruptcy Code specifically permits a trustee or

debtor-in-possession to retain professionals "on any reasonable terms and conditions of

employment."  See 11 U.S.C. §328(a).  "In sharp contrast with the old Bankruptcy Act, [this

section] now authorizes the court to ***preapprove*** a wide variety of employment arrangements

---

[2]     As set forth above, Lazard has agreed to reduce the Restructuring Fee by $1,000,000 (from $8,000,000 to
$7,000,000) and by $4,500,000 (from $8,000,000 to $3,500,000), respectively, upon the consummation of a
Restructuring or Smaller Restructuring, as the case may be.

813907.4

between [professionals] and the trustee [or debtor in possession]." In re Benassi, 72 B.R. 44, 47 (Bankr. D. Minn. 1987) (emphasis added); see also Robert J. Landry and James R. Higdon, A Primer on 11 U.S.C. 328(a) and its use in Alternative Billing Methods in Bankruptcy, 50 Mercer L. Rev. 537, 544-545 (1999).

16.     The Debtors in these cases are in the best position to assess the myriad of services they will require in attempting to effect a successful Restructuring which is beneficial to their estates, and Lazard has been and will continue to work closely with the Debtors during each step of the restructuring process.  Lazard has a unique organizational structure, comprised of research, sales, and marketing departments, all of which enable Lazard to maintain an impeccable professional position and contacts within the financial industry.  When evaluating the retention of financial professionals, courts "should not, and will not, second guess the determination of [debtors in possession], who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost."  In re Drexel Burnham Lambert Group, Inc., 133 B.R. at 21.

17.     Lazard's restructuring expertise, as well as its capital markets knowledge, financing skills and merger and acquisitions ability, all of which may be required by the Debtors during the course of these chapter 11 proceedings, were important factors in evaluating whether to retain Lazard and then in determining the amount of the Monthly Fee and the contingent Restructuring Fee.  Consistent therewith, the ultimate benefit to the Debtors of Lazard's services will not be able to be measured merely by reference to the number of hours expended by Lazard's professionals in the performance of such services.  The Restructuring Fee was agreed upon in anticipation of the substantial commitment of professional time and effort that will be required of Lazard and its professionals, in light of the fact that such commitment  may foreclose

-8-

813907.4

other employment opportunities for Lazard, and that the actual time and commitment required of

Lazard and its professionals may vary substantially from week to week and month to month,

creating "peak load" issues for Lazard.  Accordingly, coupled with the market prices for

Lazard's services in engagements of this nature, the Debtors believe that the numerous issues

that Lazard will be required to face and the numerous services that it will need to provide (and

Lazard's commitment to the variable level of time and effort that will be required to address such

issues and provide such services as they arise) demonstrate that the compensation arrangements

that have been agreed to are reasonable and appropriate.

18.    Further, while the guiding principles under the old Bankruptcy Rules were

conservation of the estate and economy of administration, Congress has declared those principles

obsolete because they discouraged practitioners from entering the bankruptcy field, where they

would have earned substantially less than in other areas of practice.  See R. Rep. No. 595, 95th

Cong., 1st Sess. 330 (1997), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6286.  It

was well recognized that, under the old rules, "[e]states were ill-served by less able bankruptcy

specialists and the costs of inefficient management were passed on to creditors."  In re Benassi,

72 B.R. 44, 47 (Bankr. D. Minn. 1987).  Here, the retention of Lazard will be efficient and cost-

effective given the highly competitive fee agreed to by Lazard, and Lazard's knowledge and

familiarity with the chapter 11 cases, generally, and the Debtors' situation, specifically.

C.    **The Terms of Lazard's Compensation**
      **May be Approved at this Time**

19.    Section 328(a) of the Bankruptcy Code enables professionals to obtain pre-

approval of the particular terms and conditions of their employment at the outset of a case.  See,

e.g., In re Benassi, 72 B.R. 44, 47 (Bankr. D. Minn. 1987).  The pre-approval of the terms of

-9-

813907.4

retention at the beginning of a chapter 11 case both minimizes problems at the time applications

for compensation are filed and provides debtors with the benefit of being able to predict the

funds which will be expended in compensating professionals.  Robert J. Landry and James R.

Higdon, A Primer on 11 U.S.C. 328(a) and its use in Alternative Billing Methods in Bankruptcy,

50 Mercer L. Rev. at 538-539.  "Prior to 1978, the most able professionals were often unwilling

to work for bankruptcy estates where their compensation would be subject to the uncertainties of

what a judge thought the work was worth after it had been done."  Matter of National Gypsum

Company, 123 F.3d 861, 863.  Here, such uncertainty may be avoided by obtaining the Court's

approval of the terms of the retention agreed to by the Debtors, Lazard, and the Creditors'

Committee, keeping in mind that the Court reserves the power to later alter the arrangement

should the terms of the agreement prove improvident under section 328(a).

813907.4

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order authorizing

the Debtors' retention of Lazard, approving the terms and conditions of the Revised Engagement

Letter and granting such other and further relief as is just or proper.


Dated: Richmond, Virginia
       November 7, 2000

<div style="margin-left:45%">

/s/ Paul V. Shalhoub
Paul V. Shalhoub
Matthew A. Feldman
WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

       -and-

H. Slayton Dabney, Jr. (No. 14145)
Patrick L. Hayden (No. 30351)
McGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
(804) 775-1000

Attorneys for Debtors and
Debtors in Possession

</div>

-11-